FILED
2026 Sep-09 PM 04:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| MATTHEW STOVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cv-01947-SGC |
| | ) | |
| KEVIN FRIDAY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**[1]

This case arises from the arrest of plaintiff Matthew Stover by defendants Kevin Friday, Sunny Singh, and Ashley Branaman. (Doc. 1).[2] Stover filed a complaint pursuant to 28 U.S.C. § 1983, asserting claims for excessive force and failure to intervene, in violation of the Fourth Amendment to the United States Constitution, and state law claims for assault and battery and wantonness. (*Id.*). The defendants moved to dismiss the complaint, and their motions are fully briefed and ripe for adjudication. (Docs. 12-14, 20, 23). For the following reasons, Branaman's motion to dismiss will be granted, and Friday and Singh's motions will be denied.

---

[1] The parties have unanimously consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 17).

[2] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

## I. Standard of Review

Dismissal under Rule 12(b)(6) is appropriate if a complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions," "a formulaic recitation of the elements of a cause of action," and "naked assertion[s] devoid of further factual enhancement" are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).

Pursuant to Rule 12(d), when ruling on a Rule 12(b)(6) motion, a district court should generally not consider matters outside the pleadings without treating the motion as one for summary judgment; if it treats the motion as one for summary judgment, the court must give the parties a reasonable opportunity to present all evidence relevant to the motion. Fed. R. Civ. P. 12(d). There are, however, two exceptions to this rule: (1) the incorporation-by-reference doctrine and (2) judicial notice. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024). Under the incorporation-by-reference doctrine, a district court may consider

an exhibit to the motion, including a video recording, if the exhibit is central to the plaintiff's claims and the authenticity of the exhibit is not challenged. *See id.*, "[W]here a video is clear and obviously contradicts the plaintiff's alleged facts, [the court] accept[s] the video's depiction instead of the complaint's account and view[s] the facts in the light depicted by the video. After all, courts are not required to rely on 'visible fiction.'" *Baker v. City of Madison, Alabama*, 67 F.4th 1268, 1277-78 (11th Cir. 2023) (internal citations omitted).

## II. Background

### A. The Complaint

Stover alleges that on the evening of November 9, 2023, he and his wife were leaving the Huddle House in Warrior, Alabama, when they were confronted by the defendants, all of whom are officers employed by the Warrior Police Department.[3] (Doc. 1 at 3). When the defendants approached Stover and patted him down, Stover asked if he was being detained. (*Id.*). Friday then slammed him to the ground without justification. (*Id.*). Stover was unarmed, not resisting arrest, and posed no apparent threat to the defendants. (*Id.* at 4). Friday pushed his elbow into the back of Stover's neck and ground his face into the concrete. (*Id.*). Branaman and Singh joined in and forcibly held Stover to the ground; Branaman was positioned near Stover's head, and Singh held Stover's ankles. (*Id.*). Friday

[3] Singh states he was employed by the Morris Police Department. (Doc. 14 at 1).

then struck Stover in the head without justification, and Branaman and Singh did not intervene. (*Id.*). Stover was transported to a local hospital for medical evaluation before being booked into jail. (*Id.*).

Stover filed this suit on November 10, 2025. (Doc. 1). He states four causes of action: (1) a claim for excessive force in violation of the Fourth Amendment against all defendants; (2) a claim for failure to intervene in violation of the Fourth Amendment against Branaman and Singh; (3) a claim for assault and battery under Alabama state law against all defendants; and (4) a claim for wantonness under Alabama state law against all defendants. (*Id.*).

**B. The Bodycam Footage**

The defendants attached to their motions to dismiss footage from Branaman's body camera depicting large portions of their encounter with Stover. (Doc. 15).[4] The footage begins in Branaman's car when she arrived at Huddle House. Branaman exited the vehicle and spoke with several individuals who described witnessing a suspected drug transaction while they were inside the restaurant. Branaman and Friday, who arrived separately, approached Stover and his wife, Adrienne Cox, as Stover and Cox exited Huddle House.[5] After the

[4] Citations to the video evidence refer to the elapsed time of the relevant portion of video. Thus, a citation to "(Bodycam at 6:00)" refers to the six-minute mark of the video from Branaman's body-mounted camera.

[5] Cox was identified at 49:28 in the bodycam footage.

officers asked whether Stover and Cox had any identification or weapons, Friday patted down Stover, and Branaman patted down Cox. (Bodycam at 00:54-1:45).

When Friday, who was positioned behind Stover, patted Stover's front left pocket, Stover placed his left hand in that pocket. Friday told him, "Don't reach in your pocket." Friday warned Stover to remove his hand from his pocket or he would be taken to jail. Stover asked why he was being patted down and what he had done. Branaman answered, "We can pat anybody down." Cox replied, "No you can't. We know our laws." (Bodycam at 1:56-2:26).

Stover continued to ask what he had done wrong as Friday repeatedly told him to remove his hand from his pocket and tried to pull his left hand from his pocket. Branaman approached Stover and Friday and placed both her hands on Stover's left arm. Stover's hand remained in his pocket. At this point, the bodycam footage shows only Stover's left arm, and the remainder of the scene is not visible. It appears Friday and Branaman then attempted to wrestle Stover to the ground while Stover's left hand remained in his pocket. (Bodycam at 2:28-2:50).

Singh joined the efforts to subdue Stover, and the officers forced Stover to the ground. Stover's left hand remained in his pocket, and he continued to ask what he had done wrong. Once Stover was on the ground, Friday knelt on top of Stover with his arm across Stover's neck. Stover protested that the officers "were violating [his] constitutional rights" and again asked what he had done wrong.

Branaman instructed him to put his hands behind his back; Stover did not comply. This continued for about thirty more seconds. (Bodycam at 3:00-3:50).

The officers repeated their instruction for Stover to remove his hand from his pocket, but he insisted he could not and continued to ask what he had done wrong. Stover started to move, and Singh said, "He's trying to get up. I've got his legs. Quit resisting." Stover replied, "How am I resisting? What am I being arrested for?" The officers continued to demand that Stover give them his hand, and Stover continued to ask what he had done. (Bodycam at 3:54-4:20).

Stover then started to moan; it is unclear from the bodycam footage what exactly is happening. Branaman instructed him to put his hands behind his back, but Stover replied, "No." She reached for Stover's left arm. It appears Friday had secured Stover on the ground underneath him and Singh had secured Stover's legs. Friday again asked for Stover's hand, and Stover asked, "Why?" Singh replied, "Please give us your other hand. We're not trying to hurt you. Give us your other hand." Stover said, "You're hurting me." Stover then cried out. The bodycam is positioned in such a way that the viewer can see only Friday's leg and the ground. A few seconds later, Friday pushed Stover's head into the ground. (Bodycam at 4:35-5:31).

Branaman rose from the ground and walked away from Stover toward Cox; her bodycam was no longer recording Friday, Singh, and Stover. Cox then

exclaimed several times, "That's not okay!" Branaman turned back toward Stover and the other officers. Singh had cuffed Stover's right hand, but his left hand remained underneath him in his pocket. (Bodycam at 5:34-5:50).

Stover rolled onto his left side and struggled against the officers. Friday hit Stover in the back of the head. Stover responded, "Hit me in the back again, son of a bitch." One of the officers ordered Stover to "give me your hand." Stover replied, "Fuck you," and Friday hit him in the back of the head. Friday held Stover's head down with his left hand while his knee remained on Stover's back. Singh picked up a small rectangular object next to Stover. Friday asked, "Is that my mag?" Stover again began to moan. Friday's left hand was on the back of Stover's neck. (Bodycam at 5:52-6:20).

Stover continued to moan and cry out, and the officers continued to ask him to give them his hand. Friday asked, "Is he still resisting?" and Singh replied, "Yeah, he's still kicking." Only the top half of Stover's body is visible at this point. Branaman removed a large stack of cash from Stover's back left pocket. Stover resumed struggling against the officers and asking them what he had done. The officers continued to demand Stover give them his hand. (Bodycam at 6:40-6:55).

After Stover told Branaman to give the money to Cox, Branaman walked away from the scene to her vehicle and placed the money in the front seat. She then

returned to Stover, Friday, and Singh, who continued their back and forth. Singh told Stover they assumed he had a weapon. (Bodycam at 7:15-7:58).

Friday began bending Stover's right hand, which was still cuffed, at the wrist. Stover cried, "This is police brutality!" He and the officers continued to struggle, but Branaman's bodycam was too close to fully capture the scene. Friday continued to try to move Stover's left hand out from under him, and he hit Stover twice in the back. (Bodycam at 8:00-8:40).

Friday asked Stover, "What's in your pocket?" Stover replied, "I want to know why I'm being detained." He began to scream again and cried, "My hand! My hand!" At this point, Branaman's arm is partially blocking the scene. Several seconds later, as the officers continued trying to subdue Stover and demand his cooperation, Stover said, "It's broke, it's broke, my hand's broke, my arm's broke." (Bodycam at 9:15-10:10).

Branaman took a few steps back and walked around the officers and Stover. Cox started to scream unintelligibly and pointed toward Stover. Branaman told her, "No he is not." Singh said, "If he was out, we'd be able to get his arm." (Bodycam at 10:30-10:45).

The three officers continued to hold Stover on the ground and demand his hand. Stover tried to roll away from underneath them, and Friday twice hit Stover in the back of his head. A fourth, unknown officer then removed a small plastic

baggie containing a white substance from Stover's left pocket. That officer hit Stover in his lower back, and Friday hit Stover in the back of his head three times. Stover then moved his left hand out from under his body, and Singh and the fourth officer worked to handcuff him. (Bodycam at 11:00-11:47).

Branaman walked away from the altercation with the baggie and approached a bystander who was filming the incident with a mobile phone. While she patted down the bystander and asked for his identification, it appears the other officers fully secured and handcuffed Stover, who was sitting up when Branaman turned back toward them. Stover's face appeared bloodied, and his eyes were rolled to the back of his head. Branaman picked up a camera from the ground and handed it to Friday. Friday told her, "I had no choice, you got my back, right?" Branaman responded, "I know you didn't, I know, I got you." (Bodycam at 12:00-13:16).

As Stover sat on the ground leaning against the legs of another officer, his eyes were rolled to the back of his head and his mouth hung open. As the officer lay Stover on the ground, Cox asked whether Stover was seizing, and the officers responded that he was just "OD'd on dope." Branaman checked Stover's other pockets and then walked away from the scene to place the baggie in her car. (Bodycam at 13:22-13:45).

Branaman walked back toward Stover and then to Cox, who was sitting on the curb in front of the restaurant. Branaman asked whether either individual had

identification. She then walked with Cox to a white Honda sedan, which Cox entered. Branaman told Cox to get out of the car, and they argued over whether Branaman could search the car without a warrant or consent. Cox searched for her identification and advised Branaman there was a gun in the car. After Branaman secured the gun, the women discussed whether Cox had, or was required to have, a pistol permit. Cox explained she kept a gun to protect herself because she worked at a Hueytown gas station at night. During this portion of the footage, Stover is not in view of the bodycam. (Bodycam at 14:30-16:02).

As Branaman walked back toward her car, she passed Stover, who was handcuffed, alone, and lying face down on the ground of the parking lot. After Branaman retrieved her cell phone from the car, she walked back toward Stover, who remained in the same position. Friday can be seen in the background talking with Cox. A man who appears to be an EMT approached Friday and examined his hands. Other EMTs approached Stover, and Branaman informed them he needed to be examined. Four of the EMTs stood around Stover, who was lying on his back on the ground, and asked him to open his eyes and state his name. (Bodycam at 16:11-19:10).

Over the next few minutes, Branaman walked around the parking lot, and Stover was not always in view. A dog, “Missy,” arrived, and Friday began to work with Missy to search the scene. Friday instructed Missy to smell a backpack the

officers found around the side of the building and then took her to search the white Honda. At this point, Stover was lying on his side on the ground with several EMTs standing around him. Stover cannot be seen in the bodycam footage for approximately four minutes while Friday and Missy searched the sedan. (Bodycam at 21:10-25:52).

After Missy positively alerted on the sedan, Branaman approached Stover and the EMTs. Stover remained on his side on the ground. Branaman and the EMTs concurred that Stover, whose vital signs were good, was "playing possum." (Bodycam at 25:52-26:04).

Friday instructed Branaman to detain Cox, and Branaman handcuffed the woman and searched her bag. When Branaman walked away from Cox, Stover was sitting up, leaning against an EMT with his head hanging down. Branaman and the EMTs discussed Stover's condition and where he should be taken for medical examination. Branaman stated, "He got punched in the head for not complying. That's the only problem he's got." Friday and Branaman discussed searching the white sedan, and Branaman left to begin that search. Stover cannot be seen during this portion of the bodycam footage. (Bodycam at 27:05-31:09).

Branaman approached Cox, who was handcuffed, and Cox told her, "I don't know what all's in [the car] but go ahead and search it. I don't care." As Branaman walked back toward the sedan, her bodycam captured an EMT hoisting Stover to

his feet. The EMT carried Stover, who was crying and moaning, by his arms to the back of an ambulance, where the EMTS loaded him onto a stretcher. Friday re-cuffed Stover's hands in front of his body. Branaman reported that Stover had "a foxtrot with Blount County for escape." (Bodycam at 32:40-34:24).

Branaman asked Friday if he wanted his magazine, and Friday replied, "Yeah. How did my magazine get out of my pouch?" Branaman and another officer responded that "he" pulled it out of Friday's pouch and went for his gun. Branaman stated that she wished she had known and "[she'd] have shot his ass." The officer just offscreen then said, "We didn't know what he had in his pocket either." (Bodycam at 35:04-35:20).

Stover was handcuffed to the gurney, and Friday exited the ambulance. Branaman asked Friday if he would ride in the ambulance, and Friday responded that he would follow. Branaman then left the ambulance area to search the vehicle. (Bodycam at 35:50-36:00). Stover cannot be seen in the bodycam footage from this point forward.

## III. Analysis

The defendants ask the court to dismiss the claims against them based on qualified immunity, state agent immunity, and peace officer immunity.[6] (Docs. 12-

[6] The defendants filed separate, virtually identical motions. (Docs. 12-14). They devote portions of their briefs to explaining the factual and legal justification for their *Terry* frisk of Stover. Stover, however, does not challenge the basis for the frisk, only the force used during his arrest.

14). In response, Stover objects to their reliance on the bodycam footage and argues the defendants fail to meet any of the requirements of the various immunity doctrines they invoke. The defendants reply that their motions are due to be granted because these facts are akin to those in *City of Atlanta*, 107 F.4th 1292.

**A. Video Footage**

Stover contends the bodycam footage is not properly authenticated, apparently because Branaman submitted it via a "self-serving affidavit [] asserting the video is 'true and correct' and depicts the events at issue." (Doc. 20 at 5). Stover offers no other argument supporting his contention that Branaman's authentication is lacking, and the defendants do not address the issue in their reply. Stover does not, however, dispute that the video truly depicts at least some of the events, though he claims it does not depict the entire incident. In fact, elsewhere in his response, he relies on the video in describing the scene.

To authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). To satisfy this requirement, a witness may testify "that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1).

---

Because the *Terry* arguments are unnecessary to analyze the issues here, the court declines to address them.

Branaman's affidavit states as follows:

> The body camera video that is attached as Exhibit "A" to the Motions to Dismiss . . . was recorded in real time by the body worn camera I was wearing at the time of the incident Stover complains of.
>
> I have reviewed the entire video in Exhibit "A" and hereby affirm that the video is true and correct, and has not been altered, amended or redacted, and the video properly, reliably and completely depicts the events Stover complains of that occurred the night of his arrest outside the Huddle House restaurant in Warrior about which he complains.

(Doc. 13 at 14). Stover cites no authority to support his contention Branaman's affidavit is insufficient to authenticate the bodycam evidence, nor does he allege the footage has been altered in any way or otherwise dispute its contents. While Stover fairly complains the video does not depict the entire scene, the court finds this is an insufficient reason to wholly disregard it, particularly given Stover himself refers to portions to support his position. Further, Stover's citation of the footage showing his arrest demonstrates its centrality to his complaint about the defendants' conduct during that arrest. *See City of Atlanta*, 107 F.4th at 1300.[7] Thus, where the video images and audio are clear and obviously contradict Stover's allegations, the court will accept its depiction; where the video is not clear, the court will, as it must, credit Stover's version of events. *See id.; see also*

---

[7] In *City of Atlanta*, also an excessive force case, the Eleventh Circuit held the district court properly considered bodycam and dashcam footage when resolving the defendants' motion for judgment on the pleadings on qualified immunity grounds. 107 F.4th at 1301. The bodycam footage showed one officer's interaction with the plaintiff, and although it did not show the technique or force the officer used, the dashcam footage filled in the gaps by providing a clear view of the force and technique used by the officer. *Id.*

*Cunningham v. Cobb Cnty, Georgia*, 141 F.4th 1201, 1211 (11th Cir. 2025) ("While we must view the facts in favor of the nonmoving party, we accept video evidence over the nonmoving party's account when the former obviously contradicts the latter.") (internal citations and quotations omitted).

**B. Qualified Immunity**

"Qualified immunity shields government employees from suit in their individual capacities for discretionary actions they perform in carrying out their duties." *City of Atlanta*, 107 F.4th at 1301 (internal citations and quotations omitted, alterations adopted). To determine whether qualified immunity applies, the court engages in a burden-shifting analysis. *Id.* First, the defendant must show he was acting within the scope of his discretionary authority when committing the challenged act.[8] *Id.* If he does, the burden shifts to the plaintiff, who must demonstrate qualified immunity is not appropriate by establishing (1) the defendant violated a constitutional right and (2) that constitutional right was "clearly established" at the time of the challenged act. *Id*. The district court has the discretion to decide which of the two prongs to consider first. *Id.*

[8] To determine whether a defendant was engaged in a discretionary function, the court considers whether the acts he undertook are of a type that fell within his job responsibilities. *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004).

**1. Discretionary Authority**

Stover first complains the defendants failed to establish they were acting within their discretionary authority in detaining and arresting him. He concedes, however, that arrests are legitimate job-related functions of police officers. (Doc. 20 at 8). While the court agrees the defendants only superficially addressed this point, "[i]t is well established that an arrest of someone suspected of violating the law is within the discretionary authority of a police officer" and the right to make an arrest necessarily carries with it the right to use some degree of physical force to effect the arrest. *Id.; Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Here, Branaman's bodycam video depicts witnesses informing her they suspected Stover of engaging in a drug transaction. The actions the defendants then took to detain and ultimately arrest Stover were within their well-established discretionary authority, which included the right to use some degree of physical force. *See City of Atlanta*, 107 F.4th at 1301*; Mobley*, 783 F.3d at 1353.

**2. Excessive Force**

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force [during] an arrest." *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1272 (11th Cir. 2021). This inquiry is governed by an objective reasonableness standard. *Id.; Hadley v.*

*Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). The court views the officers' use of force not with the benefit of hindsight but on a case-by-case basis from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts. *See City of Miami Beach*, 18 F.4th at 1272; *City of Atlanta*, 107 F.4th at 1302. The court considers the totality of the circumstances and balances the risk of bodily harm to the suspect against the gravity of the threat the officers sought to eliminate. *City of Atlanta*, 107 F.4th at 1302. The reasonableness determination must allow for the fact that police officers are often forced to make split-second judgments about the necessary amount of force in tense, uncertain, and often rapidly evolving circumstances. *Id.* Not every push or shove, even if it later seems unnecessary, violates the Fourth Amendment. *Id.*

Reviewing an officer's actions for excessive force involves two steps. First, the court determines whether the specific kind of force is categorically unconstitutional. *Id.* If not, the court considers many factors, including, but not limited to, (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; (4) the relationship

between the need and the amount of force used; and (5) the extent of the injury inflicted.[9] *Id.*

The Eleventh Circuit has "ruled specifically that a police officer violates the Fourth Amendment if he uses gratuitous force against a suspect who is secure, not resisting, and not a safety threat to the officer or other officers." *City of Miami Beach*, 18 F.4th at 1272; *see also Hadley*, 526 F.3d at 1330 (finding excessive force where officer punched suspect who was handcuffed and not struggling or resisting); *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (finding excessive an officer's use of force after the plaintiff was "arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed"). By contrast, it "may be reasonable for an officer to use force against a suspect who is resisting and not subdued." *City of Miami Beach*, 18 F.4th at 1272; *see also Mobley*, 783 F.3d at 1351, 1355 (finding no excessive force where officers struck, kicked, and tased subject who refused to surrender his hands

[9] *City of Atlanta* states that the court should consider whether an officer acted in good faith or sadistically and maliciously when evaluating an excessive force claim. 107 F.4th at 1302 (citing *Baker*, 67 F.4th at 1279, in turn citing *Hadley*, 526 F.3d at 1329, in turn citing *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000)). Other Eleventh Circuit precedent holds that the sadistic or malicious inquiry referenced in *Slicker* and *Hadley* is subjective and therefore is not part of the objective reasonableness analysis in a Fourth Amendment excessive force case. *Mobley*, 783 F.3d at 1354 (finding that *Samples v. City of Atlanta*, 916 F.2d 1548 (11th Cir. 1990) (establishing the objective reasonableness test), "predates *Slicker* and *Hadley*, so it trumps them on the issues of whether the subjective intent of the officer, specifically whether he acted maliciously and sadistically, is to be considered in a Fourth Amendment excessive force case. It is not to be considered. The test is not a subjective one but asks whether the officer's actions in applying the force were *objectively* reasonable. We do not consider whether an officer acted in good faith or sadistically and maliciously.")

even though he was pinned on the ground); *Crosby*, 394 F.3d at 1334-35 (finding no excessive force where suspect, who was lying face down on the ground, wrestled his hand loose and pushed the officer's foot away).

In *Cunningham*, bodycam footage showed police arrived at a car dealership shortly after it was burglarized. 141 F.4th at 1205. The officers saw Cunningham, who matched a 911 caller's description, walking away from the dealership and told him to stop. *Id.* Although he initially ran, one officer ultimately caught him from behind and fell on top of him. *Id.* The three officers at the scene could not handcuff Cunningham because his hands were under his body, so they used "empty-hand closed-fist strikes" to Cunningham's head and side to compel him to show his hands. *Id.* at 1206. Eventually, one officer struck Cunningham in the upper back with his elbow, and the officers were able to handcuff him. *Id.* The officers did not hit Cunningham at any point thereafter. *Id.* The Eleventh Circuit found

> [t]he record evidence here, and particularly, the Defendant Officers' body-camera footage, shows that five of the six factors we consider "from the *perspective of a reasonable officer* on the scene—severity of the crime, whether the suspect poses an immediate threat to safety, whether he is actively resisting or attempting to evade arrest, the need for the application of force, and the relationship between the need and amount of force used—weigh against"' Cunningham. The Defendant Officers reasonably believed that Cunningham committed burglary, a serious crime. Cunningham ran from the Defendant Officers into thick vegetation, when it was pitch black outside, evading arrest. The Defendant Officers had no opportunity to search Cunningham for weapons or handcuff him prior to physically engaging with him. When Officer McDonald brought Cunningham to the ground after chasing him, the Defendant Officers demanded repeatedly that

> Cunningham put his hands behind his back, but he did not comply. Instead, he kept his hands underneath his body and said only that he did nothing wrong—not that his hands were stuck. Officer McDonald eventually fought to gain control of Cunningham's right arm, but Cunningham refused to surrender his left arm, keeping it underneath his body near his waistband. Although force was used to stop Cunningham from fleeing and to gain control of his hands, none was applied once he was handcuffed.

*Id.* at 1210 (internal citations and footnotes omitted). The court found, under these circumstances, the defendants' open and closed fist strikes and elbow strikes were objectively reasonable. The court continued:

> That the Defendant Officers had not found a weapon before striking Cunningham does not mean that, from their perspective, they knew he did not have one on him. And simply because Cunningham now claims that he did not give the Officers his left hand because it was stuck does not mean that a reasonable officer at the scene would have viewed his resistance as such. And the body-camera footage shows that he never communicated why he could not comply with the Officers. Instead, the footage, with clear audio, shows that Cunningham resisted the Officers' commands and stated only, "I didn't do anything" and "what did I do." So even if Cunningham failed to comply because his arm was trapped, a reasonable officer in this situation could conclude that (1) Cunningham had a weapon on him and (2) his failure to surrender was an effort to conceal or gain control of that weapon. Because that conclusion was reasonable, the Defendant Officers' use of force in arresting Cunningham was not excessive . . . .

*Id.* at 1211.

Here, large portions of the video show Stover, who was suspected of conducting an illegal drug transaction, actively resisted arrest and refused to surrender his hands despite officers' repeated demands. At least for the events

depicted, a reasonable officer could believe the force Friday and Singh used was necessary to subdue a suspect who (1) stuffed his hand in his pocket, (2) refused to comply with numerous orders to remove his hand from his pocket, (3) struggled against multiple officers, and (4) otherwise actively resisted arrest for ten minutes. Stover's arguments to the contrary are unpersuasive. The cases he cites all involve force that occurred either (1) after a suspect was handcuffed and secured or (2) against a suspect who had surrendered both hands and who a jury could reasonably find was not resisting. Because the video evidence clearly shows Stover actively and persistently resisting arrest, the court credits it over Stover's fictional allegations to the contrary. *See Cunningham*, 141 F.4th at 1211. Further, Stover cites no authority that clearly establishes as excessive the officers' use of force during the approximately ten minutes he resisted arrest. Consequently, all defendants are entitled to qualified immunity for the force depicted on the video.

The bodycam footage, however, does not show the final moments of Stover's arrest. Branaman walked away as the other officers gained control of Stover's left hand, almost ten minutes after Friday first told him to get his hand out of his pocket;[10] her camera did not visually capture the point at which the officers fully gained control of and handcuffed Stover, although the sound of the metal

---

[10] (*See* Bodycam at 11:45).

handcuffs appears to be audible as Branaman turned her attention to a bystander. From this point, Stover is out of the camera's view for approximately 35 seconds.[11]

While the defendants urge the court to dismiss Stover's claims based on *City of Atlanta*, that court had the benefit of both bodycam and dashboard footage, which clearly contradicted the plaintiff's allegations. *See* 107 F.4th at 1301. Here, the defendants have not presented other video evidence showing Friday and Singh's actions immediately after they finally secured Stover's left hand until they are back in view, some thirty seconds later. The standard on a motion to dismiss prevents the court from filling in this gap in the defendants' favor. Rather, the court must accept the plaintiff's allegations as true, where the video evidence does not clearly contradict them. *Baker*, 67 F.4th 1268, 1277-78. Accordingly, the court cannot find Friday and Singh are entitled to qualified immunity on Stover's excessive force claim. The video does, however, conclusively establish that Branaman did not use excessive force, and her motion to dismiss will therefore be granted on this claim.

**3. Failure to Intervene**

The Eleventh Circuit has "long recognized that 'an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'" *Nute v.*

---

[11] (*See* Bodycam at 11:48-12:25).

*White*, 152 F.4th 1311, 1319 (11th Cir. 2025) (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) and citing *Helm v. Rainbow City, Alabama*, 989 F.3d 1265, 1272 (11th Cir. 2021) ("The principle that an officer must intervene when he or she witnesses unconstitutional force has been clearly established in this Circuit for decades")). It is further "clearly established law that a failure to intervene claim does not require that the defendant officer had authority over the officer inflicting excessive force." *Id.*

An officer may be entitled to qualified immunity if the infliction of excessive force occurred too quickly for him to have had a reasonable opportunity to intervene. *Id.* For example, in *Brown v. City of Huntsville, Alabama*, the court found that an officer did not have a reasonable opportunity to intervene to prevent another officer's use of pepper spray on the plaintiff for up to three seconds. 608 F.3d 724, 740 n.25 (11th Cir. 2010). By contrast, in *Priester v. City of Riviera Beach, Florida*, the Eleventh Circuit reversed the district court's grant of qualified immunity to an officer who watched another officer's police dog bite a non-resisting plaintiff for as long as two minutes. 208 F.3d 919, 925 (11th Cir. 2000). And in *Salvato v. Miley*, the court affirmed the denial of qualified immunity to an officer who failed to stop another one from tasing an arrestee multiple times because she had enough time to call for medical assistance and take the other

officer's handcuffs to restrain the suspect, and she admitted that she could have told the other officer to stop. 790 F.3d 1286, 1289 (11th Cir. 2015).

Here, the court must reach the same conclusion on Stover's failure-to-intervene claim as it did with his excessive-force claim. The portions of the bodycam footage that clearly depict the events show no excessive force, and without excessive force, there can be no failure to intervene. *See Bolton v. Sheriff of Coweta Cnty., GA*, 177 F.4th 1067, 1075 (11th Cir. 2026) ("An officer cannot fail to intervene when there is no constitutional violation to thwart.") Because the video depicts no excessive force, neither Branaman nor Singh can be liable for failing to intervene to stop the force the video does depict. Further, Branaman was not present for any possible excessive force alleged by Stover after she turned away from him and the officers to pat down a bystander; thus, it is clear she did not witness or have a reasonable opportunity to prevent any excessive force. She is therefore entitled to qualified immunity on this claim in its entirety. However, the video does not clearly portray the point at which Friday and Singh fully handcuffed Stover or the seconds immediately thereafter. Because the court cannot know what force, if any, may have been used during that time, it cannot fairly analyze whether Singh is entitled to qualified immunity on Stover's claim for failure to intervene.

**C. State Agent and Peace Officer Immunity**

Although the defendants invoke state agent immunity, they offer no argument to support it. The Alabama Supreme Court recognized state agent immunity in *Ex parte Cranman* 792 So. 2d 392, 405 (Ala. 2000), *holding modified by Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006). However, the *Cranman* court recognized a state agent, like the defendants, "*shall not* be immune from civil liability in his or her personal capacity (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* (emphasis added).

The defendants also cite Ala. Code § 6-5-338, asserting this section grants them "peace officer" immunity under Alabama state law.[12] As the defendants acknowledge, § 6-5-338 does not apply to conduct by a police officer that "is so

[12] This statue was repealed effective October 1, 2025, and the defendants have not established whether the court should analyze their claims under it or § 6-5-338.2, which appears to have replaced § 6-5-338. Section 6-5-338.2 provides immunity from civil liability for law enforcement officers for conduct performed within their discretionary authority, but it exempts conduct that constitutes a tort against the plaintiff actionable under Alabama law where (1) the officer acted recklessly without law enforcement justification or (2) the conduct violated a clearly established state statutory or constitutional right of the plaintiff of which every reasonable officer would have known at the time of the officer's conduct.

egregious as to amount to willful or malicious conduct or conduct engaged in bad faith." *Couch v. City of Sheffield*, 708 So. 2d 144, 153 (Ala. 1998).

Because Friday and Singh's encounter with Stover was not fully depicted on video, the court cannot conclude their conduct was entirely lawful. Viewing the evidence in the light most favorable to Stover, the court must entertain the possibility that, during the short time they were off camera after Stover was fully secured, Friday and Sing acted willfully or maliciously or otherwise engaged in the type of egregious conduct that would prohibit the application of either immunity provision. Branaman, however, is entitled to peace officer immunity for Stover's state law claims. As established above, she was conducting an act within her discretionary authority as a police officer when she participated in Stover's arrest, and the video conclusively establishes that she did not use excessive or otherwise gratuitous force in helping to subdue Stover. *See, e.g., Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 742 (11th Cir. 2010) (finding officer who was entitled to qualified immunity from § 1983 claims was likewise entitled to state agent immunity for state tort claims).

## IV. Conclusion

For the reasons stated above, Branaman's motion to dismiss is **GRANTED** (Doc. 13), and Friday and Singh's motions to dismiss are **DENIED**. (Docs. 12, 14). The stay of discovery is **LIFTED**, and the remaining parties are **ORDERED**

to conduct a new Rule 26(f) conference within 14 days of the date of this order. Counsel **SHALL** file a report of their planning meeting within 7 days thereafter. The parties are **DIRECTED** to review the court's February 6, 2026 order for other instructions regarding the Rule 26(f) conference. (Doc. 11).

**DONE** this 9th day of September, 2026.

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE